## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Christine Civitarese, Joann Crippin,<br>Melissa Goss, Nancy Hagberg,<br>Gary Hagberg, Clayton Hendricks,<br>Leslie Mathis, for themselves and on<br>behalf of all others similarly situated, | Civil Action No.<br>_____ <br><br>JURY TRIAL DEMANDED |

       *Plaintiffs*,

       v.

THE 3M COMPANY, f/k/a Minnesota Mining
and Manufacturing, Co.; TYCO FIRE
PRODUCTS L.P., successor in interest to THE
ANSUL COMPANY; BUCKEYE FIRE
PROTECTION CO.; CHEMGUARD;
NATIONAL FOAM, INC.,; KIDDE FIRE
FIGHTING, INC., f/k/a CHUBB NATIONAL
FOAM, INC., f/k/a NATIONAL FOAM,
INC., individually and as successor in interest
to NATIONAL FOAM, INC.; KIDDE PLC,
INC., f/k/a WILLIAMS US INC., f/k/a
WILLIAMS HOLDINGS, INC.,  individually
and as successor in interest to NATIONAL
FOAM, INC.; KIDDE-FENWAL, INC.,
individually and as successor in interest to
NATIONAL FOAM, INC.; and UTC FIRE &
SECURITY AMERICAS CORPORATION,
INC., f/k/a GE INTERLOGIX, INC.,
individually and as successor in interest to
NATIONAL FOAM, INC.

       *Defendants.*

## CLASS ACTION AND INDIVIDUAL COMPLAINT

Plaintiffs, by and through their undersigned counsel, hereby file this Class Action

Complaint, individually, and on behalf of all others similarly situated, with individual claims and

make these allegations based on information and belief against Defendants, THE 3M COMPANY

(f/k/a Minnesota Mining and Manufacturing, Co); TYCO FIRE PRODUCTS L.P., successor in

interest to THE ANSUL COMPANY; BUCKEYE FIRE PROTECTION CO.; CHEMGUARD; NATIONAL FOAM, INC (collectively "Defendants"):

## INTRODUCTION

1.      The Plaintiffs, individually and on behalf of others similarly situated, bring this action for damages sustained to their person, their property, and for medical monitoring that was caused by the contamination caused and/or created by the Defendants' products.

2.      The Defendants manufactured and sold aqueous film forming foam ("AFFF"), a fire fighting agent used for fighting Class B fires. Class B fires are fires whose fuel is flammable liquid.

3.      The AFFF manufactured by the Defendants contain the fluorinated surfactants PFOS (perfluorooctanesulfonic acid) and PFOA (perfluorooctanoic acid) and/or contain the precursors of PFOS and PFOA.

4.      The Defendants knew or should have known that PFOS and PFOA are persistent when released into the environment and present significant risks to human health and the environment.

5.      Nevertheless, the Defendants marketed and sold AFFF with the knowledge that PFOS and/or PFOA would be released into the environment in firefighting training exercises and in firefighting emergencies.

6.      Through this action, the Plaintiffs seek damages for the damage to their persons, their property, and for medical monitoring that is necessary as the result of PFOS and PFOA contamination in the groundwater, surface water, and affected areas from the use and/or storage of AFFF at the Barnstable Fire Training Academy and Barnstable Municipal Airport.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees and is between citizens of different States.

8.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## THE PARTIES

### Plaintiffs and Class Representatives

9.      Class Representatives with Individual Personal Injury and Property Damage Claims:

10.     Plaintiff Christine Civitarese is a resident of Hyannis, MA, who has resided at all times material at 54 Sea Street, Apartment #2, Hyannis, MA  02601. The property receives water from the municipal wells of the Hyannis Water System, operated by the Barnstable Department of Public Works' ("DPW's") Water Supply Division. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances.

11.     Christine Civitarese regularly consumed, bathed in, washed with, and cooked with Barnstable DPW's water containing PFCs.  As a result, Christine Civitarese has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood putting her at a substantially increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and kidney cancer.  As a result of her exposure to PFCs in the contaminated water supply, Christine Civitarese has been diagnosed with thyroid disease, high cholesterol and high blood pressure.

12.    Plaintiff Joann Crippin is a resident of Hyannis, MA, who at all relevant times resided at 688 Yarmouth Road, Hyannis, MA  02601. The property receives water from the municipal wells of the Hyannis Water System, operated by the Barnstable DPW's Water Supply Division. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances.

13.    Joann Crippen regularly consumed, bathed in, washed with, and cooked with Barnstable DPW's water containing PFCs.  As a result she has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood putting her at a substantially increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and kidney cancer.   In addition, as a result of her exposure to PFCs in the contaminated water supply, Joann Crippin has been diagnosed with high blood pressure, high cholesterol, and pregnancy problems.

14.    Plaintiff Melissa Goss is a resident of Hyannis, MA, who resides at and owns the property at 127 Hamden Circle, Hyannis, MA 02601.   The property receives water from the municipal wells of the Hyannis Water System, operated by the Barnstable DPW's Water Supply Division.  PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances.

15.    Melissa Goss regularly consumed, bathed in, washed with, and cooked with Barnstable DPW's water containing PFCs.  As a result she has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood putting her at a substantially increased risk of developing several health conditions, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and kidney cancer.   As a result of her exposure to PFCs in the contaminated water supply, Melissa Goss has been diagnosed

with high blood pressure, high cholesterol, and pregnancy problems.    As a result of the contamination, Melissa Goss's property has decreased in value.

16.    Plaintiff Nancy Hagberg is a resident of Hyannis, MA, who at all relevant times owned and resided at 151 Pine Ave., Hyannis, MA  02601. The property receives water from the municipal wells of the Hyannis Water System, operated by the Barnstable DPW's Water Supply Division. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances.

17.    Nancy Hagberg regularly consumed, bathed in, washed with, and cooked with Barnstable DPW's water containing PFCs. As a result she has been significantly exposed to elevated levels of PFCs. As a result of her exposure to PFCs in the contaminated water supply, Nancy Hagberg has been diagnosed with kidney issues, liver disease, thyroid disease, high cholesterol, and high blood pressure. She is also at a substantially increased risk of developing several health conditions, including but not limited to effects immune system, changes in thyroid hormone, reproductive issues, and kidney cancer.   As a result of the contamination, Nancy Hagberg's property has decreased in value.

18.    Plaintiff Gary Hagberg is a resident of Hyannis, MA, who at all relevant times resided at 151 Pine Ave., Hyannis, MA  02601. The property receives water from the municipal wells of the Hyannis Water System, operated by the Barnstable Department of Public Works' ("DPW's") Water Supply Division. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances.

19.    Gary Hagberg regularly consumed, bathed in, washed with, and cooked with Barnstable DPW's water containing PFCs.   As a result, Gary Hagberg has been exposed to significantly elevated levels of PFCs and is at a substantially increased risk of developing several

health conditions, including but not limited effects on the immune system, changes in thyroid hormone, kidney cancer, testicular cancer, high cholesterol, and thyroid issues.  As a result of his exposure to PFCs in the contaminated water supply, Gary Hagberg has been diagnosed with liver disease and high blood pressure.  As a result of the contamination, Gary Hagberg's property has decreased in value.

20.     Plaintiff Clayton Hendricks is a resident of Hyannis, MA, who at all relevant times owned and resided at 148 Baxter Rd., Hyannis, MA  02601. The property receives water from the municipal wells of the Hyannis Water System, operated by the Barnstable DPW's Water Supply Division. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances.

21.     Clayton Hendricks regularly consumed, bathed in, washed with, and cooked with Barnstable DPW's water containing PFCs. As a result he has been significantly exposed to elevated levels of PFCs and is at a substantially increased risk of developing several health conditions, including but not limited to effects on the immune system, effects on the liver, high blood pressure, high cholesterol, changes in thyroid hormone, kidney cancer, testicular cancer, and thyroid issues. As a result of exposure to PFCs, Clayton Hendrick's property has decreased in value.

22.     Plaintiff Leslie Mathis is a resident of Hyannis, MA, who at all relevant times owned resided at 279 Oak Neck Rd., Hyannis, MA  02601. The property receives water from the municipal wells of the Hyannis Water System, operated by the Barnstable DPW's Water Supply Division. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances. As a result of exposure to PFCs, Leslie Mathis' property has decreased in value.

23.     Leslie Mathis regularly consumed, bathed in, washed with, and cooked with Barnstable DPW's water containing PFCs.  As a result she has been exposed to significantly elevated levels of PFCs and is at a substantially increased risk of developing several health conditions, including but not limited to effects on the immune system, changes in thyroid hormone, reproductive issues, effects on the liver, and kidney cancer. As a result of her exposure to PFCs in the contaminated water supply, Leslie Mathis has been diagnosed with high cholesterol and high blood pressure.

**Defendants**

24.     Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

25.     Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold AFFF containing PFOS. 3M was the only company that manufactured or sold AFFF containing PFOS.

26.     3M manufactured and/or distributed and/or sold AFFF foam containing PFOS which was used at the Fire Academy and Airport.

27.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership formed in the State of Delaware with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI]. Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990. (Ansul and Tyco (as the successor in interest to Ansul), will hereinafter be collectively referred to as "Tyco/Ansul.")

28.    Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorocarbon surfactants containing PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained fluorocarbon surfactants containing PFOA.

29.    Tyco/Ansul manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at the Fire Academy and Airport.

30.    Defendant Angus Fire ("Angus") has its corporate headquarters in Bentham, North Yorkshire, United Kingdom. Angus' head office in the United States is located at 141 Junny Rd., Angier, North Carolina 27501.

31.    Beginning in or around 1994, Angus began manufacturing AFFF that contained PFOA.

32.    Angus manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at the Fire Academy and Airport.

33.    Defendant Chemguard is a Wisconsin corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

34.    Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA.

35.    Chemguard manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at the Fire Academy and Airport.

36.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

37.     Buckeye manufactured, distributed and/or sold AFFF containing PFOA which was used at the Fire Academy and Airport.

38.     Defendant National Foam, Inc. (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.  At all times relevant, NATIONAL FOAM designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at the Fire Academy and Airport.

39.     Defendant KIDDE FIRE FIGHTING, INC., f/k/a CHUBB NATIONAL FOAM, INC., f/k/a NATIONAL FOAM INC., is a North Carolina corporation having a principal place of business at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615. At all times relevant, KIDDE FIRE FIGHTING, INC. designed, manufactured and sold AFFF used in training operations and for emergency fire-fighting situations including at the Fire Academy and Airport.

40.     KIDDE FIRE FIGHTING, INC., is sued individually, and as successor in interest to NATIONAL FOAM, INC.

41.     KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC., is a Connecticut corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302. At all times relevant, KIDDE PLC, INC. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at the Fire Academy and Airport.

42.     KIDDE PLC, INC., is sued individually, as a successor in interest to NATIONAL FOAM, INC.

43.     Upon information and belief, WILLIAMS HOLDINGS, INC. was incorporated on October 10, 1987, and later dissolved on December 31, 1990.

44.     Upon information and belief, John F. Hannon was the CEO and Secretary of WILLIAMS HOLDINGS, INC. At all times relevant, WILLIAMS HOLDINGS, INC. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at the Fire Academy and Airport.

45.     Upon information and belief, WILLIAMS CORPORATION was founded in 1997, and dissolved on October 26, 2000. Upon information and belief, John F. Hannon was the CEO of Williams Corporation, as well as the Treasurer of KIDDE FIRE FIGHTING, INC. prior to the dissolution of Williams Corporation.

46.     Upon information and belief, WILLIAMS HOLDINGS, INC., a Delaware corporation, filed as a foreign corporation with the Massachusetts Secretary of State on June 2, 1987.

47.     Upon information and belief, John F. Hannon changed the name of WILLIAMS HOLDINGS, INC. to WILLIAMS HOLDINGS US, INC., on February 12, 1998.

48.     Upon information and belief, WILLIAMS HOLDINGS US, INC. became KIDDE PLC, INC. on November 15, 2000.

49.     WILLIAMS HOLDINGS, INC. is named as successor in interest to NATIONAL FOAM, INC.

50.     KIDDE-FENWAL, INC. is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721. At all times relevant, KIDDE-FENWAL, INC. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at the Fire Academy and Airport.

51.     Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to KIDDE-FENWAL, INC.

52.    Upon information and belief, the Canadian Intellectual Property Office has registered the NATIONAL FOAM trademark to KIDDE-FENWAL, INC., formerly registered to KIDDE FIRE FIGHTING, INC.

53.    KIDDE-FENWAL, INC., is sued individually, and as successor in interest to NATIONAL FOAM, INC.

54.    UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE INTERLOGIX, INC., is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. At all times relevant, UTC FIRE & SECURITY AMERICAS CORPORATION, INC. designed, manufactured and sold AFFF used for training operations and fighting fires including at the Fire Academy and Airport.

55.    Upon information and belief, KIDDE-FENWAL, INC. is part of the UTC CLIMATE CONTROL & SECURITY unit of United Technologies Corporation.

56.    UTC FIRE & SECURITY AMERICAS CORPORATION, INC., is sued individually, and as successor in interest to NATIONAL FOAM, INC.

57.    NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC., f/k/a CHUBB NATIONAL FOAM, INC., f/k/a NATIONAL FOAM INC., individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC., individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC., individually and as successor in interest to NATIONAL FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE INTERLOGIX, INC.; shall collectively be referred to herein as "NATIONAL FOAM."

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

58.    AFFF formulations are chemical mixtures used to extinguish hydrocarbon fuel-based fires.

59.    AFFF containing fluorinated surfactants have a better firefighting capability than plain water due to their surface-tension lowering properties- essentially smothering the fire and starving it of its oxygen.

60.    However, some fluorinated surfactants have unique properties that cause some of the compounds to not biodegrade and to bioaccumulate, and are toxic to animals and humans.

61.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

62.    AFFF was introduced commercially in the mid-1960s and rapidly became the primary firefighting foam in the U.S. and in many parts of the world.

63.    AFFF is synthetically formed by combining fluorine free hydrocarbon foaming agents with surfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film forming foam.

64.    Defendants 3M, Tyco/Ansul, National Foam, Chemguard and Buckeye designed, manufactured, and sold AFFF that was used at the Fire Training Academy and Airport.

65.    Fluorosurfactants used in 3M's AFFF were produced by a unique and patented process known as electrochemical fluorination ("ECF"). The ECF process resulted in a product that contains PFOS, some of which degrades into PFOA.

66.    3M was the only company to manufacture PFOS-containing AFFF.

12

67.    In an attempt to limit liability, 3M opted to stop producing PFOS 2002 because it was aware of the looming chemical exposure and health effects on the public.

68.    Similarly, PFOA is a man-made, manufactured chemical not found in nature. PFOA was used to make household and commercial products that resist heat and chemical reactions, and has many uses, including repelling oil, stains, grease, and water.

69.    In 1947, 3M began producing PFOA via ECF.

70.    In 1951, 3M began selling its PFOA to other chemical companies, including DuPont.

71.    Other companies, such as Defendants Tyco/Ansul, Buckeye, National Foam, and Chemguard began manufacturing AFFF using PFOA that they produced themselves or purchased from other companies. Defendants' AFFF was then for use at airports, fire departments and industrial facilities across the nation.

72.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment. Some PFC's, such as PFOS and PFOA, have been found to bioaccumulate in humans and animals. In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

73.    By the early 1960s, 3M knew that PFOS and PFOA were stable, persistent in the environment, and do not degrade.

74.    Early studies showed that PFC's accumulated in the human body and were "toxic." 3M studies from the 1970s concluded that PFC's were "even more toxic" than previously believed.

75.     Upon information and belief, by the 1970's, 3M knew that its PFC's (PFOA and PFOS) were widely present in the blood of the general U.S. population. Upon information and belief, 3M concealed this knowledge from the public and government regulators.

76.     In or about 1977, Tyco/Ansul was also aware of the environmental and toxic concerns of its AFFF and undertook a study and investigation on more environmentally improved AFFF.

77.     PFOA is readily absorbed after consumption or inhalation, and it accumulates primarily in the blood stream, kidney, and liver.

78.     Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the U.S. Environmental Protection Agency's ("EPA") PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

79.     PFOA can remain in the environment, particularly in water, for many years and can move through air, soil, and into groundwater.

80.     Human studies show associations between increased PFOA levels in blood and an increased risk of several health conditions, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

81.     These injuries can arise months or years after exposure to PFOA.

82.     PFOA's extreme persistence in the environment, along with its toxicity, mobility, and bioaccumulation potential, pose probable adverse effects to human health and the environment.

**The Contamination**

83.     Plaintiffs, individually and on behalf of the putative classes, seek damages for the damages to their health, to their property, and for the establishment of a medical monitoring program necessitated by the presence of PFOS and PFOA contamination on their property, in the surface and groundwater, and contamination of the municipal water supply as the result of the use of AFFF manufactured and distributed by Defendants.

84.     The County of Barnstable, Massachusetts ("County"), is a duly incorporated body politic and corporate under the laws of the Commonwealth of Massachusetts, with its primary address at 3195 Main Street, Barnstable, Massachusetts 02630. The County has a population of approximately 215,000 and includes the Cape Cod Towns of Bourne, Brewster, Chatham, Dennis, Eastham, Falmouth, Harwich, Mashpee, Orleans, Provincetown, Sandwich, Truro, Wellfleet and Yarmouth.

85.     The County owns approximately five acres of land located off Mary Dunn Road in Barnstable ("County Property"), Massachusetts on which the Barnstable County Fire Training Academy ("Academy") operates.

86.     The Town of Barnstable, Massachusetts (the "Town") is a duly incorporated political subdivision of the Commonwealth with its primary address at Barnstable Town Hall, 367 Main Street, Hyannis, MA 02601.

**The Fire Training Academy**

87.     The County owns, operates and manages the Academy at 155 South Flint Rock Road, Barnstable, MA.

88.     In June 1956, pursuant to a vote of the Town, the County leased the County Property owned by the Enoch T. Cobb Trust (the "Cobb Trust"), a public charitable trust created for the benefit of Barnstable public schools. The County Property had been a woodlot.

89.     The County has conducted and permitted others, including the staff of the Pilgrim Nuclear Power Plant and the Massachusetts Maritime Academy, to conduct fire training activities at the County Property since 1956. By special legislation in 1958, the County was authorized to construct and maintain a firefighting training school at the County Property. That statute stated that "[s]aid school shall be under the direction of the county commissioners of said county and shall provide instruction in fire fighting and fire prevention ...." St. 1958, c. 570, § 1.

90.     The County acquired the County Property from the Cobb Trust in 1983, and has continued the fire training activities since then.

91.     Until at least 2009, fire training activities at the Academy involved the use of Aqueous Fire Fighting Foam ("AFFF"). PFOS and PFOA are constituents of AFFF.

### The Barnstable Municipal Airport

92.     The Town of Barnstable, Massachusetts ("Town") is a duly incorporated political subdivision of the Commonwealth with its primary address at Barnstable Town Hall, 367 Main Street, Hyannis, MA 02601 and is the owner and operator of the Barnstable Municipal Airport ("Airport"), 480 Barnstable Road, Hyannis, MA 02601.

93.     At the Airport, which is owned and operated by the Town, AFFF was regularly used for onsite fire training exercises, including, but not limited to, AFFF deployment, use and testing as required by the Federal Aviation Administration ("FAA").

16

94.     On November 10, 2016, DEP issued a Notice of Responsibility and Request for Immediate Response Action ("NOR/RIRA") to the Airport pursuant to G.L. c 21E on account of releases of PFCs to the groundwater at the Airport.

95.     The NOR/RIRA states that PFOS / PFOA are present in groundwater monitoring wells at the Barnstable Municipal Airport at levels above EPA's Health Advisory.

### Contamination of the Municipal Wells

96.     The Town owns the properties located at 629, 656 and 798 Mary Dunn Road (the "Town Property"). In the 1970s, the Barnstable Water Company, a privately-owned company, installed four municipal water supply wells, Mary Dunn Wells Nos. 1-4, on the Town Property.

97.     In 2005, the Town acquired the Hyannis Water System from the Barnstable Water Company and took over those wells. Those wells are four of the Town's 11 wells that supply drinking water to the Hyannis Water System, operated by the Barnstable Department of Public Works' ("DPW's") Water Supply Division.

98.     The System serves approximately 18,000 residential and commercial customers in three Barnstable villages: Hyannis, Hyannisport, and West Hyannisport. Hyannis is the medical and economic center of Cape Cod and the affected wells provide water to Cape Cod Hospital, the Cape Cod Mall, and approximately 4,200 primary and high school students.

99.     The Hyannis Water System serves an Environmental Justice population, defined as a segment of the population that is "at risk of being disparately and negatively impacted by environmental policies and overburdened by a higher density of known contaminated sites and by air and water pollution." *See Executive Order on Environmental Justice*, Exec. Order No. 552 (Nov. 20, 2014).

100.    In the fall of 2013, the County began sampling groundwater monitoring wells near the Academy. It found PFOS in the soil at the County Property and in groundwater downgradient from the Academy and the Mary Dunn Wells.

101.    In 2014 and early 2015, both the Town and the County conducted additional sampling to confirm the presence and levels of PFOS in the Mary Dunn Wells. The PFOS in two of those wells has consistently exceeded EPA's PHA guideline of 0.2 µg/l:

        a.    Mary Dunn Well 1 ("MD-1") had 0.33 µg/l of PFOS in January 2015 and 0.28 µg/l in March 2015.
        b.    Mary Dunn Well 2 ("MD-2") had 0.43 µg/l of PFOS in May 2014, 0.96 µg/l in January 2015, and 1.6 µg/l in March 2015.

102.    In June 2016, testing by the Town found that MD-1 had 0.110 µg/l of PFOS; and MD-2 had 0.250 µg/l. These levels exceeded EPA's current lifetime health advisory, and the level in MD-2 continues to exceed EPA's PHA guideline.

103.    Recent PFOS levels found in Mary Dunn Well 3 ("MD-3'") were 0.2 µg/l in April 2016, between 0.170 and 0.180 µg/l in May 2016, and 0.120 µg/l in June 2016 also exceed EPA's lifetime health advisory limit.

104.    The releases of large quantities of water in firefighting training activities on the County Property is further spreading the contamination and exacerbating the contamination.

## Response Actions

105.    In the spring of 2015, the Town consulted with the DEP about the threat to public health and the environment from the PFOS contamination in MD-1 and MD-2. It removed those wells from service in May 2015.

106.    The Town subsequently evaluated and developed a treatment system for those wells. In consultation with the County and the DEP it selected a granular activated carbon ("GAC") adsorptive treatment system to treat the groundwater flowing into the wells.

107.    On May 7, 2015, the Barnstable DPW obtained emergency authorization from the Town Council to borrow and expend funds to install and operate treatment systems at the Mary Dunn well field. In letters dated May 25 and July 14, 2015, DEP approved the installation and activation of the treatment systems.

108.    In July 2015, the Town installed and activated the treatment systems, and brought MD-1 and MD-2 back on line.

109.    Despite having treatment systems installed on MD-1 and MD-2 to remove the PFOS / PFOA contamination, the Town continued to rely heavily on MD-3, even though MD-3 had no filtration system and was at risk of further contamination. The Town did not remove MD-3 from service at this time.

110.    The Town's unusually heavy reliance on MD-3 caused it to recharge from sources that were further away than MD-3 would have normally drawn from under normal pumping practices potentially drawing from areas with increased PFOA / PFOS contamination.

111.    After the EPA reduced its lifetime health advisory for PFOS from 0.2 parts per billion ("ppb") and PFOA from 0.4 ppb to 0.07 ppb combined PFOS and PFOA in May 2016, the Town removed MD-3 from service because its PFOS / PFOA levels exceeded that limit.

112.    The Town did not remove MD-3 from service until after May 2016 when EPA's current Public Health Advisory for PFOA and PFOS was released.  Subsequently it installed a carbon filtration system. The Town brought MD-3 back on line in early July 2016, after the treatment system was in place.

**Health Effects of PFOS and PFOA Exposure**

113.    Many parties have studied PFOS and PFOA, sometimes referred to as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

114.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

115.    The non-cancer health effects of PFOS are the same as PFOA.

116.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[1]

117.    The USEPA's Lifetime Health Advisory and Health Effects of 70 ppt, set in May 2016, was an attempt to identify the concentration of PFOA and/or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure.[2]

---

[1] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[2] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016).

118.    Many states, however, have issued lower regulatory limits. For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level (MCL) of 14 ppt for PFOA.

119.    California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.

120.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November, 2017, which included $42 Million to remediate PFC contamination from military bases, as well as devoting $7 Million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.

121.    Currently Massachusetts follows the USEPA level of 70 ppt for combined PFOA and PFOS levels.

**PFOS and PFOA Are Hazardous Materials Under the Laws of Massachusetts**

122.    PFOA and PFOS are "hazardous materials" under the laws of Massachusetts.

123.    Massachusetts General Laws Chapter 21E defines "hazardous material" as:

[A] ny material, in whatever form, which, because of its quantity, concentration, chemical, corrosive, flammable, reactive, toxic, infectious or radioactive characteristics, either separately or in combination with any substance or substances, constitutes. a present or potential threat to human health, safety, welfare, or to the environment, when improperly stored, treated, transported, disposed of, used, or otherwise managed.

G.L. 21E, § 2.

124.    PFOS and PFOA are considered hazardous materials pursuant to 310 CMR 40.0006 and 310 CMR 40.0342(1)(a) and are subject to chapter 21 of Massachusetts General Laws quoted *supra*.

125.    PFOS and PFOA are hazardous materials because they pose a "present or potential threat to human health." *Id*; *see also, National Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 3, 6 (D.C. Cir. 2015) (referring to PFOS as a "toxic compound" and a "hazardous chemical.")

126.    In 2009, the United States Environmental Protection Agency (EPA) established a provisional health advisory ("PHA") for PFOS of 0.2 micrograms per liter (µg/l) (200 ppt) of water. In a 2014 Peer Review publication, the EPA advised that water containing higher levels of PFOS can cause short and long-term adverse health effects and should not be used for drinking or cooking.

127.    Since 2013, the EPA has required public water systems to sample for contaminants that it deems potential threats to human health but for which it has not yet established maximum contaminant levels.

128.    PFOS and PFOA are such contaminants. *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3)for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

129.    On May 25, 2016, EPA established a lifetime health advisory for combined PFOS and PFOA of 0.07 µg/l (70 ppt). *Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate*, 81 Fed. Reg. 33250 (May 25, 2016). It noted that:

> Studies indicate that exposure to PFOS and PFOA over certain levels may result in adverse health effects, including developmental effects to fetuses during pregnancy or to breast-fed infants (*e.g.*, low birth weight, accelerated puberty, skeletal variations), cancer (*e.g.*, testicular, kidney), liver effects (*e.g*, tissue damage), immune effects (*e.g.*, antibody production and immunity), and other effects (*e.g.*, cholesterol changes).

**The Putative Class and Plaintiffs Exposure and Damages**

130.     Plaintiffs and the Putative Class have been injured as a result of receiving water with elevated levels of PFCs, including PFOA / PFOS.

131.     Plaintiffs and the Putative Class have suffered exposure, personal injury, the bioaccumulation of PFCs in their blood which causes known cancers and diseases, property damage, and the diminution of property value as a result of the PFC contamination caused by AFFF of the groundwater utilized by the municipal and private water supplies as well as the surface water.

132.     As a result of years of consuming contaminated water and being exposed to PFCs, the Plaintiffs and the Putative Class, as residents who consumed water from the municipal wells of the Hyannis Water System, operated by the Barnstable Department of Public Works' ("DPW's") Water Supply Division, have been unknowingly exposed for many years to PFCs at concentrations hazardous to their health through the ingestion and dermal absorption of PFOA and PFOS.

133.     The properties of the Plaintiffs and the Putative Class have been damaged as a result of the presence of PFCs in their homes, their soil, surrounding property and potable water supply.

134.     Plaintiffs and the Putative Class seek recovery from all Defendants for injuries, damages and losses suffered by the Plaintiffs, each of whom suffered injuries as a direct and proximate result of exposure to and consumption of PFC-contaminated water from the municipal and private drinking water supplies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

**AFFF Usage at the Fire Training Academy and Airport**

135.    Upon information and belief, Defendants each manufactured AFFF containing PFC's for sale with knowledge that it would be used in training and for emergency fire-fighting situations.

136.    Upon information and belief, Defendants sold their AFFF products and they were used at the Fire Training Academy and Airport.

137.    At any given time, the Fire Training Academy and Airport stored and used AFFF concentrate, designed, manufactured and sold by each of the Defendants.

138.    The AFFF was expected to, and did, reach the Fire Training Academy and Airport without substantial change in the condition in which it was sold to the USAF.

139.    For decades, training exercises were conducted at Fire Training Academy and Airport including firefighting training that used AFFF designed, manufactured and sold by each of the Defendants.

140.    AFFF was also used in the prevention / containing of fires at the Airport.

141.    AFFF was released into the environment and into the air, soil and groundwater at locations including but not limited to the Fire Training Academy and Airport.

142.    As a direct and proximate result of the failure to warn the those responsible for the Fire Training Academy and Airport, the AFFF and its constituents were permitted to enter the air, soil, and groundwater, and ultimately enter Plaintiffs' and the Putative Classes' bodies and properties.

143.    Upon information and belief, instructions, warning labels and material safety data sheets that were provided with the AFFF by the Defendants, did not reasonably nor adequately

describe the health and environmental hazards of AFFF, which Defendants knew or should have known.

## CLASS ACTION ALLEGATIONS

144.    Plaintiffs incorporate the forgoing paragraphs as though the same were set forth at length herein.

145.    Plaintiffs bring this action as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed subclasses and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery as follows:

a.    **Medical Monitoring Class**: Individuals who consumed water from the Hyannis Water System, operated by the Barnstable Department of Public Works' Water Supply Division.

b.    **Property Damage Class**: Individuals who own real property serviced by the Hyannis Water System, operated by the Barnstable Department of Public Works' Water Supply Division. This class can be readily ascertained by Census data, property records, and county records.

146.    Plaintiffs are members of the proposed Classes they seek to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

147.    Excluded from the Class are:

i.    Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

ii.    The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

iii.    Any class counsel or their immediate family members; and

iv.     All governmental entities.

148.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

### Numerosity and Ascertainability

149.     This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1), given that the number of impacted individuals and property owners, upon information and belief, has reached the thousands, making individual joinder of class members' respective claims impracticable. While the exact number of class members is not yet known, a precise number can be ascertained from U.S. Federal Census records, the Commonwealth of Massachusetts and the public records of the municipal entities, and through other appropriate discovery. The resolution of the claims of the class members in a single action will provide substantial benefits to all parties and the Court. It is expected that the class members will number in the tens of thousands.

150.     Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

### Typicality

151.     Pursuant to Federal Rules of Civil Procedure 23(a)(3), Plaintiffs' claims are typical of the claims of class members and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred damages and losses related to the introduction of PFOA, PFOS, and other PFC's into the water supplies causing personal injury and property damages.

152.     Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury

to all Class Members. The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

**Adequacy of Representation**

153.    Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent.

154.    Further, Plaintiffs have retained counsel competent and well experienced in class action and environmental tort litigation.

155.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the Class.

**Predominance of Common Issues**

156.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, making it appropriate to bring this action under Rule 23(b)(3). The answers to these common questions will advance resolution of the litigation as to all Class Members. Common legal and factual issues include:

     i.    Whether Defendants engaged in the conduct alleged herein.

    ii.    Whether Defendants knew or should have known that exposure to PFOA and PFOS could increase health risks.

   iii.    Whether Manufacturing Defendants knew or should have known that their manufacture of AFFF containing PFOA and PFOS was unreasonably dangerous.

   iv.    Whether Manufacturing Defendants knew or should have known that their AFFF contained persistent, stable, and mobile chemicals that were likely to contaminate groundwater water supplies.

    v.    Whether Manufacturing Defendants failed to sufficiently warn of the potential for harm that resulted from use of their products.

27

vi.   Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS and failed to warn users and Plaintiffs and the Class of same.

vii.   The extent to which Defendants knew about the PFOA and PFOS contamination in the water in the Areas of Investigation.

viii.   The extent to which Defendants knew about the PFOA and PFOS contamination in the water supply system.

ix.   Whether the Defendants owed a duty to the Plaintiffs and the Class to refrain from the actions that caused the contamination of the drinking water with PFOA and PFOS.

x.   Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFOA and PFOS.

xi.   For the Medical Monitoring Class, whether Plaintiffs and Class Members were exposed to water containing elevated levels of PFOA and PFOS while living in Barnstable County.

xii.   For the Property Damage Class, whether the PFOA and PFOS contamination caused and continues to cause:

(1) A continuous invasion of the property rights of the Plaintiffs and Class such that the property values have and/or continue to decline in value following the disclosure of the PFOA contamination; and

(2) Have substantially interfered with Plaintiffs' and the Class' use and enjoyment of their property.

xiii.   Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount.

xiv.   Whether the members of the Classes have sustained damages and the proper measure of damages.

xv.   Whether Manufacturing Defendants are strictly liable to Plaintiffs and the Class for their actions.

xvi.   Whether Defendants are liable to Plaintiffs and the Class for their actions.

## Superiority

157.   The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Given the great number of individuals in the Areas of Investigation impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims due to the risk of inconsistent or contradictory

judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

## AFFF CONTAINING PFOA AND PFOS IS FUNGIBLE AND COMMINGLED IN THE GROUNDWATER

158. AFFF containing PFOA and/or PFOS, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF.

159. A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF coming from different manufacturers.

160. The case here in Hyannis, Hyannisport, and West Hyannisport is typical: even though several areas were located at the Fire Training Academy and Airport where AFFF was used and entered the groundwater, investigators could determine the identity of the manufacturers whose AFFF containing PFOA and PFOS contributed to the resulting groundwater contamination plume.

161. Because precise identification of the specific manufacture of any given AFFF that was the source of PFOA and PFOS found in a Class members' blood, a water well, or the groundwater, is impossible, Plaintiffs must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiffs and the Class.

162. Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF containing PFOA and PFOS, at Plaintiffs' and the Classes' expense, to contaminate Plaintiffs' and the Classes' drinking

water supply, and to attempt to avoid liability for such contamination of the groundwater and poisoning of the Plaintiffs and the Class.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

163.    Defendants in this action are manufacturers that control a substantial share of the market for AFFF-containing PFOA and/or PFOS in the United States and are jointly responsible for the contamination of the groundwater in the Communities and for causing the damages and injuries complained of in this Complaint.  Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF-containing PFOA and/or PFOS at issue in this Complaint. PFOA and PFOS are fungible; it is impossible to identify the exact Defendant who manufactured any given batch of AFFF containing PFOA and/or PFOS found free in the air, soil or groundwater, and each of these Defendants participated in a state-wide and national market for AFFF containing PFOA and/or PFOS during the relevant time.

164.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF-containing PFOA and/or PFOS.

165.    Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

## CAUSES OF ACTION FOR CLASS ACTION AND INDIVIDUAL CLAIMS

### FIRST CAUSE OF ACTION: NEGLIGENCE

166.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

30

167.    This cause of action is brought pursuant to Massachusetts State statutory and common law.

168.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

169.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health, bioaccumulated in the blood, and caused serious health effects, including cancer.

170.    Defendants also knew or should have known that PFC's are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate water supplies if released into the environment.

171.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the municipal and private well drinking supplies of Hyannis, Hyannisport, and West Hyannisport, as a result of these communities' proximity to the Fire Training Academy and Airport.

172.    Defendants owed a duty to Plaintiffs to act reasonably and not place inherently dangerous AFFF into the marketplace when its release into the drinking water supplies was imminent and certain.

173.    Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFC's would be used in training exercises and in emergency situations at the Fire Training Academy and Airport, in such a manner that dangerous chemicals would be released into the environment.

174.    Further, Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFC's would be stored in fire suppressant systems and tanks and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the environment.

175.    Knowing of the dangerous and hazardous properties of AFFF, and the manner in which AFFF would be used, stored, and maintained at the Fire Training Academeny and the Airport, it was foreseeable that AFFF would contaminate the surrounding environment, groundwater, and drinking water supplies of Hyannis, Hyannisport, and West Hyannisport.

176.    Defendants therefore knew or should have known that safety precautions would be required to prevent the release of PFOA and PFOS into the surrounding environment, groundwater, and drinking water supplies.

177.    The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiffs and the Class was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

178.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

179.    Considering the above factors related to risk, foreseeability, social utility, burden of guarding against the harm, and the practical consequences of placing that burden on the Defendants, the Defendants therefore owed a cognizable duty to Plaintiffs and the Class not to contaminate their municipal and private well drinking water supplies and the surrounding environment and groundwater with AFFF, containing dangerous levels of PFC's.

180.    Defendants had a duty to warn of the hazards associated with AFFF, containing PFC's, entering and poisoning the environment and groundwater.

181.    Defendants, as manufacturers, marketers, and sellers of AFFF owed Plaintiffs and the Class a cognizable duty to exercise reasonable care to ensure that AFFF was manufactured, marketed, and sold in such a way as to ensure that the end users of AFFF were aware of the potential harm PFOA and PFOS can cause to human health and the environment.

182.    Upon learning of the release of the contaminants, all Defendants owed Plaintiffs and the Class a duty to warn and notify Plaintiffs and the Class of the release of the contamination before it injured Plaintiffs and the Class and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

183.    Defendants breached their duty by allowing PFOA and PFOS to be released into the municipal and private well drinking water supplies of Hyannis, Hyannisport, and West Hyannisport, and through their failure to warn and notify the end users of AFFF of the danger that PFOA and PFOS would enter into the environment and groundwater.

184.    As such, the Defendants, negligently, grossly negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties to the Plaintiffs and the Class, causing the contamination of the municipal and private well drinking water supplies in and around the residences of Plaintiffs and the Class.

185.    Defendants further breached the duties owed to the Plaintiffs and the Class by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

186.    Defendants' failure to notify the Plaintiffs and the Class in a timely manner of the contamination of the municipal and private well drinking water supplies, and, consequently, the

presence of PFOA and PFOS in the real properties of Plaintiffs constitutes another breach of the duties that Defendants owed Plaintiffs and the Class.

187.    Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' and the Class' injuries, damages, and the imminent, substantial, and impending harm to their health and property.

188.    Defendants' breaches of their duties caused the drinking water in both the municipal and private well supplies to become contaminated with unsafe and dangerous levels of PFOA and PFOS.

189.    Further, Defendants' breach of their duty to timely notify the community and act reasonably in warning of the presence of PFOA and PFOS in AFFF, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years.

190.    Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Class, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

191.    Accordingly, Plaintiffs and the Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons and property, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the

cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

## SECOND CAUSE OF ACTION: MEDICAL MONITORING

192.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

193.    This cause of action is brought pursuant to Federal and Massachusetts State statutory and common law.

194.    Medical monitoring is available to Plaintiffs and Class Members who have yet to sustain a present injury as a stand-alone cause of action as the increased risk of developing the diseases and conditions discussed *supra* constitute an injury-in-fact and also as an element of damages associated with Plaintiffs and Class Members other claims for those Plaintiffs and Class Members who have sustained a present injury.

195.    A claim for medical monitoring requires that (1) The defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint. *Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 226 (2009); *see also, In re Paoli R.R. Yard PCB Litig.,*

916 F.2d 829, 852 (3rd Cir. 1990); *Krottner v. Starbucks Corp.,* 628 F.3d 1139, 1142 (9th Cir. 2010).

196.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the municipal and private well drinking water supplies of Hyannis, Hyannisport, and West Hyannisport, as a result of these communities' proximity to the Fire Training Academy and Airport.

197.    Defendants knew or should have known that exposing humans to PFC-contaminated water would be hazardous to human health and the environment.

198.    The Plaintiffs and the Classes have been exposed to PFOA, PFOS, and potentially other toxic substances that resulted from the use, storage, and discharge of AFFF at the Fire Training Academy and Airport.

199.    As described more fully above in this Complaint, PFOA and PFOS exposure leads to the bioaccumulation of PFOA and PFOS in the blood, seriously increasing the risk of contracting numerous diseases. Medical tests currently exist that can determine the level of PFOA and PFOS in the blood.

200.    Given that exposure to and bioaccumulation of PFOA and PFOS significantly increases the risk of contracting a serious medical condition, periodic medical examinations to detect latent diseases are both reasonable and necessary. A thorough medical monitoring plan, following common and accepted medical practices, can and should be developed for the Plaintiffs and the Classes to assist in the early detection and beneficial treatment of the diseases that can develop as a result of exposure to PFOA and PFOS.

**THIRD CAUSE OF ACTION: PRODUCTS LIABILITY – FAILURE TO WARN**

201.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

202.    This cause of action is brought pursuant to Massachusetts State statutory and common law.

203.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

204.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health and the environment.

205.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the municipal and private water supply as a result of its proximity to the Fire Training Academy and Airport.

206.    Defendants had the duty to warn of the hazards associated with AFFF entering and poisoning the environment and groundwater because they knew of the dangerous, hazardous and toxic properties of the AFFF.

207.    Defendants failed to provide sufficient warning that the use and storage of Defendants' product would cause the product to be released into the environment and cause the contamination of the environment, groundwater, and drinking water, with PFOA and PFOS.

208.    Further, this contamination led to the exposure and bioaccumulation of PFOA and PFOS of the Plaintiffs and the Class, and increased their risk of developing numerous diseases as more fully set forth above.

209.    Adequate instructions and warnings on the AFFF products could have reduced or avoided these foreseeable risks of harm to Plaintiffs and the Class and their properties.

210.    Had Defendants provided adequate warnings, Plaintiffs and the Class could have taken measures to avoid or lessen their exposure.

211.    Had Defendants provided adequate warnings to the end users, steps could have been taken to reduce or prevent the release of PFOA and PFOS into the environment, groundwater, and drinking water.

212.    Defendants' failure to warn was a direct and proximate cause of the environmental and health impacts from PFOA and PFOS that came from the use, storage and disposal of AFFF at the Fire Training Academy and Airport.

213.    As such, Defendants' failure to provide adequate and sufficient warnings for the AFFF that they manufactured, marketed, and sold renders the AFFF a defective product.

214.    As a result of Defendants' conduct and the resulting contamination, the value and marketability of the property of the Plaintiffs' and Property Damage Class has been and will continue to be diminished. Plaintiffs and the Class have suffered the need for and the cost of remediation of their properties and or mitigation systems for those properties, and the cost of alterative water.

215.    As a result of the contamination, Plaintiffs and the Class have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by Defendants.

216.    As a result of Defendants' conduct and the resulting contamination, the Plaintiffs and the Classes have been injured in that their exposure to PFOS, PFOA, and potentially other

toxic substances has caused them to develop illnesses associated with this exposure as more fully described and/or significantly increased their risk of developing those illnesses.

217.    As a result of Defendants' manufacture, sale or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiffs and Class Members.

218.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

**FOURTH CAUSE OF ACTION: PRODUCTS LIABILITY – DEFECTIVE DESIGN**

219.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

220.    This cause of action is brought pursuant to Massachusetts State statutory and common law.

221.    Defendants knew or should have known that exposure to PFOA and/or PFOS was hazardous to the environment and to human health.

222.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFOA and/or PFOS, was hazardous to human health and the environment.

223.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and/or PFOS would result in the contamination of the municipal and private water supply as a result of its proximity to the Fire Training Academy and Airport.

224.    Knowing of the dangerous and hazardous properties of the AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFOA or PFOS.

225.    These alternative designs and/or formulations were already available, practical, and technologically feasible.

226.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to persons and property that was caused by the Defendants' manufacture, marketing, and sale of AFFF that contained PFOA or PFOS.

227.    Additionally, the AFFF that was manufactured, marketed, and sold by the Defendants contained PFOA and/or PFOS chemicals that were so toxic and dangerous to human health and the environment, mobile, and persistent, that the act of designing, formulating, manufacturing, marketing, and selling this product was unreasonably dangerous under the circumstances.

228.    Further, this contamination then led to the exposure and bioaccumulation of PFOA and PFOS to the residents in Hyannis, Hyannisport, and West Hyannisport and increased their risk of numerous diseases.

229.    The AFFF manufactured, marketed, and sold by the Defendants was defectively designed as the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

230.    Defendants' defective design and formulation of AFFF was a direct and proximate cause of the environmental and health impacts from PFOA and PFOS, that came from the use and storage of AFFF at the Fire Training Academy and Airport.

231.    As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the value and marketability of the property of the Plaintiffs' and Property Damage Class has been and will continue to be diminished. Plaintiffs and the Class Members have suffered

the need for and the cost of remediation of their properties and or mitigation systems for those properties, and the cost of alterative water.

232.    As a direct result of the contamination Plaintiffs and the Plaintiff Class have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by Defendants.

233.    As a direct result of Defendants' defective design and formulation of AFFF, the resulting contamination, the Plaintiffs and the Classes have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has caused them to develop illnesses associated with this exposure as more fully described and/or significantly increased their risk of developing those illnesses.

234.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to the Plaintiffs and Class Members.

235.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

**FIFTH CAUSE OF ACTION: PRIVATE NUISANCE & TRESPASS**

236.    Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

237.    This cause of action is brought pursuant to the laws of Massachusetts State statutory and common law.

238.    Plaintiffs and the Property Damage Class, as described above, are owners of real property with the right of possession.

239.    A private nuisance is actionable "when a property owner creates, permits, or maintains a condition or activity on [its] property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another." *Taygeta Corp. v. Varian*

41

*Assocs.*, 436 Mass. 217, 231, 763 N.E.2d 1053 (2002), *quoting Doe v. New Bedford Hous. Auth.*, 417 Mass. 273, 288, 630 N.E.2d 248 (1994).

240.     At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the AFFF that was used at the Fire Training Academy and Airport that resulted in the contamination of the water supply relied upon by Plaintiffs and Property Damage Class at all relevant times.

241.     At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFOA and PFOS would and/or could be introduced into the properties of Plaintiffs and the Property Damage Class.

242.     The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFOA and PFOS to be disbursed through the water and onto the land and property of Plaintiffs and the Property Damage Class.

243.     Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOA and PFOS to be released into the drinking water for residential areas near the Fire Training Academy and Airport.

244.     The introduction of unknown quantities of PFOA and PFOS onto the property of the Plaintiffs and Property Damage Class unreasonably interfered with the use and enjoyment of their property.

245.     The potential danger from the drinking water at their residences has caused the Plaintiffs and the Class significant and unreasonable inconvenience and expense.

246.     This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

247.    Accordingly, Plaintiffs and the Class seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons and property, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous nuisance, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, and nominal damages, flowing from the nuisance which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

### SIXTH CAUSE OF ACTION – DAMAGE TO REAL PROPERTY UNDER MASSACHUSETTS OIL & HAZARDOUS MATERIAL RELEASE PREVENTION ACT

248.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

249.    This cause of action is brought pursuant to Massachusetts General Laws 21E § 5.

250.    Plaintiffs and the Property Damage Class, as described above, are owners of real property with the right of possession.

251.    Defendants are liable under MGL § 5(A)(3), (4), & (5).

252.    At all times relevant to the present cause of action, Defendants directly or indirectly arranged by contract or agreement for the transportation, disposal, storage, or treatment of the AFFF that was used at the Fire Training Academy and Airport that resulted in the contamination of the water supply relied upon by Plaintiffs and Property Damage Class at all relevant times.

253.    But for the Defendants conduct, the release of AFFF into the surrounding environment from the Fire Training Academy and Airport would not have occurred..

254.    Accordingly, Plaintiffs and the Class seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons and property, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous nuisance, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, nominal damages, and attorney's fees and costs in an amount to be proved at trial.

## CLAIM FOR PUNITIVE DAMAGES

255.    Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the preceding as if fully restated herein.

256.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and injuries upon the persons and properties of Plaintiffs and the Class, disregarding their protected rights.

257.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFOA and PFOS, which they knew to be carcinogenic, was not ingested by Plaintiffs and the Class.

258.    Defendants have caused great harm to the property and water supplies of Plaintiffs and the Class and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and the Classes demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.      certification of the proposed Classes;

B.      a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the Classes;

C.      an order requiring that Defendants pay for a testing and monitoring protocol to test each property and its drinking water for the properties belonging to the members of the Property Damage Class;

D.      an order establishing a medical monitoring protocol for Plaintiffs and the Class;

E.      an award to Plaintiffs and the Class of general, compensatory, exemplary, consequential, nominal, and punitive damages;

F.      an order for an award of attorney fees and costs, as provided by law;

G.      an award of pre-judgment and post-judgment interest as provided by law; and

H.      an order for all such other relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of any and all issues in this matter so triable.

Dated this 18th day of April, 2018.

/s/ Brian R. Cunha
_____
Brian Cuhna, Esq.
B.B.O.#108560
311 Pine Street
Fall River, Mass 02720
Louise R. Caro, Esq.
*Pro Hac Vice Application Forthcoming*
Napoli Shkolnik PLLC
2665 South Bayshore Dr. Suite 220
Coconut Grove, Florida 33133